UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KDDI GLOBAL LLC, | : |
| Plaintiff, | : Civil Action No. 17-5445-BRM-DEA |
| v. | : |
| FISK TELECOM LLC, | : OPINION |
| Defendant. | : |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court are Plaintiff KDDI Global LLC's ("Plaintiff") Motion for Permanent Injunction (ECF No. 5) and Defendant Fisk Telecom LLC's ("Defendant") Cross-Motion to Dismiss the Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 7). All Motions are opposed. (ECF No. 7 and ECF No. 10.) Pursuant to Federal Rule of Civil Procedure 78(a), the Court heard oral argument on November 15, 2017.[1] For the reasons set forth below, Defendant's Motion to Dismiss is **GRANTED** and Plaintiff's Motion for Preliminary Injunction is **DISMISSED** as **MOOT**.

**I.    BACKGROUND**

For the purpose of the Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Further, the Court also considers any

---

[1] At Oral Argument, the parties informed the Court that they have temporarily stayed their arbitration pending this decision.

"document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original).

Plaintiff is a limited liability company organized under the laws of the State of Delaware, with its principle place of business in New Jersey and is wholly owned by KDDI Corporation, a Japanese corporation with its principal place of business in Japan. (Compl. (ECF No. 1) ¶¶ 1-2.) Defendant is a limited liability company organized under the laws of the State of New York, with its principal place of business in New York. (*Id.* ¶ 3.) All listed members of Defendant are also residents of the State of New York. (*Id.* ¶ 4.) Both Plaintiff and Defendant are providers of international telecommunications service. (Reciprocal Carrier Services Agreement ("Carrier Agreement") (ECF No. 1-2, Ex. A, at 1).)

On October 27, 2014, Plaintiff and Defendant entered into the Carrier Agreement, pursuant to which they agreed to "purchase certain telecommunications services provided" from one another. (ECF No. 1 ¶ 8 and ECF No. 1-2, Ex. A, at 1.) The Carrier Agreement also contains the following dispute resolution provisions:

> 13.1 The Parties desire to resolve disputes arising of or relating to this Agreement without litigation. Therefore, except for action seeking a temporary restraining order or an injunction relating to the purposes of this Agreement, or suit to compel compliance with this dispute resolution process, the Parties agree to use the following alternative dispute resolution procedures as the sole remedy with respect to any controversy or claim arising out of relating to his Agreement or its breach.
>
> 13.2 At the written request of either Party, each Party will appoint a knowledgeable representative to meet and negotiate in good faith to resolve any dispute arising out of or relating to this Agreement. The representatives shall have the discretion to determine the location, format, frequency and duration of their negotiations, and to utilize other alternative dispute resolution procedures such as mediation to assist in the negotiations. All discussions and correspondence among the representatives shall be treated as confidential information developed for the purposes of settlement, exempt from

2

discovery, and shall not be admissible in the arbitration described below or in any lawsuit without the agreement of the Parties.

13.3 If the negotiations do not resolve the dispute within sixty (60) days of the initial written request, the dispute shall be submitted to binding arbitration by a single arbitrator at the office of the American Arbitration Association ("AAA") located in Newark, New Jersey. The arbitration shall be held in accordance with the AAA's commercial Arbitration Rules, as may be applicable to the dispute. The cost of the arbitration, including the fees and expenses of the arbitrator(s), shall be shared equally by the parties unless the arbitration award provides otherwise. Each party shall bear the cost of preparing and presenting its case. The arbitrator(s) are not empowered to award damages in excess of compensatory damages and each Party irrevocably waives any damages in excess of compensatory damages. Te [sic] Parties agree to undertake all responsible steps to expedite the arbitration process. Judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction.

(ECF No. 1-2, Ex. A, at 9-10.) Moreover, the Carrier Agreement provides:

15.4 <u>Governing Laws.</u> This Agreement shall be governed by the laws of the State of New York, without reference to its principles of conflict of laws. Both parties irrevocably consent and submit to personal jurisdiction in the courts of the State of New York for all matters arising under this Agreement.

(*Id.* at 11.)

From November 16, 2014, through May 15, 2016, Plaintiff and Defendant performed under their reciprocal portions of the Carrier Agreement. (ECF No. 1 ¶ 12.) The amounts owed by Defendant were offset against the amounts owed by Plaintiff to Defendant and the net balance was paid by Defendant. (*Id.*) "However, after the offsets were applied, [Defendant] refused to pay invoices dated April 16, 2016, April 16, 2016, April 20, 2016, April 20, 2016, May 1, 2016, and May 16, 2016." (*Id.*) Those payments were allegedly due within seven calendar days of being invoiced. (*Id.* ¶ 13.) When Defendant did not respond to Plaintiff's demands for payment of the above invoices, Plaintiff filed a Demand for Arbitration on August 1, 2016. (*Id.* ¶ 14.) On March

31, 2017, Defendant filed an Answer to Plaintiff's Demand for Arbitration and Counterclaims against Plaintiff alleging, in relevant part, tortious interference with contract/business relations and tortious interference with prospective contractual and business relationships. (*Id.* ¶ 17 and *see* Def.'s Answer to Demand (ECF No. 1-1, Ex. 2).) In response to Defendant's Answer and Counterclaims, Plaintiff filed a motion to dismiss the Demand with the Arbitrator, arguing the tortious interference claims were not covered by the Carrier Agreement, and thus not arbitrable under the Agreement. (ECF No. 1 ¶ 18 and *see* Pl.'s Mot. to Dismiss (ECF No. 6, Ex. C).) While the motion to dismiss was pending before the Arbitrator, Defendant requested, and received an extension to file an amended demand. (ECF No. 1 ¶ 18.)

On June 19, 2017, Defendant filed an Amended Demand for Arbitration, containing eight causes of action: (1) breach of the Carrier Agreement; (2) breach of other, unspecified, agreements; (3) promissory/equitable estoppel; (4) unjust enrichment; (5) gross negligence; (6) negligent misrepresentation; (7) tortious interference with contract/business relations; and (8) tortious interference with prospective contractual and business relationships. (*Id.* ¶¶ 19-20.) Plaintiff concedes the first six causes of action "are premised on allegations arising out of or related to [Plaintiff's] sale of telecommunications services to [Defendant] under the Carrier Agreement." (*Id.* ¶ 21.) However, it alleges "[t]he seventh and eighth causes of action . . . allege that [Plaintiff] tortuously interfered with an unrelated transaction with a third-party: specifically, the alleged prospective sale of a business to [Defendant] by Locus Telecommunications, LLC ('Locus')." (*Id.* ¶ 22.) Locus is also a wholly owned subsidiary of Plaintiff's parent company, KDDI Corporation. (*Id.* ¶ 23.)

As to the tortious interference with contract/business relations claim, Defendant alleged, in relevant part:

144. At all relevant times, [Plaintiff] had knowledge of the contractual and business relationships and obligations between [Defendant] and Locus.

145. Despite said knowledge, [Plaintiff] intentionally, improperly, wrongfully, and tortuously interfered with said contractual and business relationship by inducing Locus or attempting to induce Locus to violate or repudiate its contractual and business obligations to sell its calling card business to [Defendant].

146. Upon information and belief, [Plaintiff], through Ed Kim, CEO of [Plaintiff], and others, learned of the impending sale of Locus' calling card division to [Defendant] in or about October 2015.

147. Ed Kim breached the confidentiality provisions of the Carrier Agreement by sharing [Defendant]'s proprietary and confidential information with Locus.

148. In addition, [Plaintiff] breached the terms of the Carrier Agreement by providing inferior services to [Defendant]. [Plaintiff] did so in order to reduce the amount of traffic sent by [Defendant] to [Plaintiff].

149. [Plaintiff] then told Locus, among other things, not to sell the calling card division to [Defendant] because [Defendant]'s traffic was diminishing. [Plaintiff] also shared [Defendant]'s confidential information with Locus in breach of the terms of the Carrier Agreement to further induce and interfere with the sale of the calling car division to [Defendant].

. . . .

159. [Plaintiff], therefore, interfered with and inflicted injury upon [Defendant] and [Defendant]'s business, business relationships and prospective business relationships by its intentional, tortious, and malicious activities, all of which it undertook by wrongful means, including, but not limited to, using [Defendant]'s proprietary and confidential business information without any excuse or justification.

160. [Plaintiff]'s wrongful interference was not merely an incident of healthy competition but, rather, a willful effort to misappropriate information and deceptively using that information to provide for its own ends.

5

(ECF No. 1-1, Ex. 3 ¶¶ 144-49, 159-60.) As to the tortious interference with prospective contractual and business relationships, Defendant alleged, in relevant part:

> 164. At all relevant times, [Plaintiff] had knowledge of the prospective contractual and business relationships and obligations between [Defendant] and Locus concerning the sale of the calling card division.
>
> 165. Upon information and belief, [Plaintiff], through Ed Kim, CEO of [Plaintiff], and others, learned of the impending sale of Locus' calling card division to [Defendant] in or about October 2015.
>
> 166. [Plaintiff], through Ed Kim, breached the confidentiality provisions of the Carrier Agreement by sharing [Defendant]'s proprietary and confidential information with Locus without any excuse or justification.
>
> 167. In addition, [Plaintiff] breached the terms of the Carrier Agreement by providing inferior services to [Defendant]. [Plaintiff] did so in order to reduce the amount of traffic sent by [Defendant] to [Plaintiff].

(*Id.* ¶¶ 164-67.)

On July 26, 2017, Plaintiff filed a Complaint and a Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction. (ECF No. 1.) Plaintiff's Motion for a TRO and Preliminary Injunction sought to enjoin the arbitration of Defendant's tortious interference counterclaims in his Amended Demand. (ECF No. 1-3.) On that same day, the Court denied Plaintiff's Motion for temporary restraints, directed Plaintiff to re-file the motion as a formal motion on the Court Docket, and asked Defendant to respond to Plaintiff's Motion for a Preliminary Injunction. (ECF No. 4.) On July 26, 2017, Plaintiff re-filed its motion as a Motion for Preliminary Injunction. (ECF No. 5.) On September 8, 2017, in response to the Motion for Preliminary Injunction, Defendant filed an opposition and Cross-Motion to Dismiss. (ECF No. 7.)

## II. LEGAL STANDARDS

### A. Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the Plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than 'an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While as a general rule, a court many not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir.1999). Specifically, courts may consider any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

**B. Preliminary Injunction**

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). "A plaintiff seeking a preliminary injunction must establish that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Ferring*, 765 F.3d at 210 (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The movant bears the burden of showing these four factors weigh in favor of granting the injunction, and a failure to establish any one factor will render a preliminary injunction inappropriate. *Id.*

### III. DECISION

#### A. Motion to Dismiss

Defendant argues Plaintiff's Complaint should be dismissed on four grounds: (1) the Carrier Agreement contains a forum selection clause mandating that any disputes must be brought in New York State Court; (2) New York and New Jersey law require arbitration of Defendant's tortious interference claims; (3) the question of arbitrability should be decided by the Arbitrator; and (4) Plaintiff waived its right to judicial determination of arbitrability by affirmative participation in the arbitration. (*See* ECF No. 6.) Plaintiff argues venue is proper in the District of New Jersey because the forum selection clause in the Carrier Agreement is permissive, not mandatory. (ECF No. 10 at 2-6.) Plaintiff further contends the Court is to decide issues of arbitrability and that tortious interference claims are outside the scope of the Carrier Agreement's arbitration clause. (*See id.* at 6-11.) Lastly, Plaintiff argues Defendant's waiver argument is misplaced and raised in bad faith. (*Id.* at 11-13.)

Defendant does not contend Plaintiff failed to meet its burden of stating a claim, but rather that the arbitration provision in the Carrier Agreement requires the claim to be arbitrated. Indeed, the parties agree the Carrier Agreement's arbitration provision is valid, but disagree as to whether the agreement covers Defendant's tortious interference claims. Because the Court finds the issue of arbitrability is to be decided by the Arbitrator, it need not determine whether this matter should have been brought in New York State Court or whether Plaintiff waived its right to judicial determination of arbitrability by affirmative participation in the arbitration.

Generally, pursuant to the Federal Arbitration Act ("FAA"), the issue of arbitrability should be decided by the courts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943-45 (1995); *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 208 (2d Cir. 2005). "However, the

question of arbitrability is one for an arbitrator and not for the courts if there is 'clear and unmistakable evidence' that the parties intended to submit the question for arbitration." *Offshore Expl. & Prod. LLC v. Morgan Stanley Private Bank, N.A.*, 986 F. Supp. 2d 308, 315 (S.D.N.Y. 2013), *aff'd*, 626 F. App'x 303 (2d Cir. 2015) (quoting *Contec Corp.*, 398 F.3d at 208); *see Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002). New York State law, which applies to the contracts in this case, follows the same rules with respect to the presumption relating to arbitrability.[2] *Offshore Expl. & Prod. LLC*, 986 F. Supp. 2d at 315; *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("New York law follows the same rule, i.e., it acknowledges the 'well settled proposition that the question of arbitrability is an issue generally for judicial determination,' but at the same time it recognized an 'important legal and practical exception' when parties 'evince[] a "clear and unmistakable" agreement to arbitrate arbitrability.'" (quoting *Smith Barney Shearson Inc. v. Sacharow*, 689 N.E.2d 884, 886 (1997)).

When "parties explicitly incorporate [into arbitration agreements] rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec*, 398 F.3d at 208; *see also Shaw Grp. Inc.*, 322 F.3d at 121; *In re Smith Barney Shearson Inc. v. Sacharow*, 689 N.E.2d 884, 888 (N.Y. 1997); *Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*, 66 A.D.3d 495 (N.Y. App. Div. 2009). In *Contec*, the Court of Appeals held the parties had clearly and unmistakably demonstrated their intent to let an arbitrator determine arbitrability by stating that arbitration should proceed "in accordance with the Commercial Arbitration Rules of the American Arbitration Association" because the American Arbitration Association Commercial

---

[2] The Carrier Agreement provides that it "shall be governed by the laws of the State of New York, without reference to its principles of conflict of laws." (ECF No. 1-2 at 11.) Indeed, the parties do not dispute New York law applies.

Arbitration Rule 7 commits threshold questions of arbitrability to the arbitrator. 398 F.3d at 208–11.

The arbitration provision at issue in this case provides:

> 13.3 If the negotiations do not resolve the dispute within sixty (60) days of the initial written request, the dispute shall be submitted to binding arbitration by a single arbitrator at the office of the American Arbitration Association ("AAA") located in Newark, New Jersey. *The arbitration shall be held in accordance with the AAA's Commercial Arbitration Rules*, as may be applicable to the dispute. The cost of the arbitration, including the fees and expenses of the arbitrator(s), shall be shared equally by the parties unless the arbitration award provides otherwise. Each party shall bear the cost of preparing and presenting its case. The arbitrator(s) are not empowered to award damages in excess of compensatory damages and each Party irrevocably waives any damages in excess of compensatory damages. Te [sic] Parties agree to undertake all responsible steps to expedite the arbitration process. Judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction.

(ECF No. 1-2, Ex. A, at 9-10 (emphasis added).) Most importantly, the arbitration provision states "[t]he arbitration shall be held in accordance with the AAA's Commercial Arbitration Rules, as may be applicable to the dispute." Rule 7(a) of the AAA's Commercial Arbitration Rules provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." American Arbitration Association, Commercial Arbitration Rules, Rule 7 (Oct. 1, 2013). This language mirrors exactly the language held to constitute clear and unmistakable evidence of the parties' intent to submit arbitrability to arbitration in *Contec*, 398 F.3d at 208 and *Offshore Expl. & Prod. LLC*, 986 F. Supp. 2d at 315. Plaintiff's argument that the parties did not intended for an arbitrator to determine arbitrability because "the Carrier Agreement expressly reveals the parties' intent to exclude this type of matter from arbitration" is misguided. (ECF No. 10 at 6-7.) The question of whether an arbitrator has the power to decide issues of

arbitrability is separate from the question of whether or not Defendant's tortious interference claims fall within the arbitration provision. Therefore, the parties have manifested their clear and unmistakable intent to delegate to the arbitrator the threshold question of arbitrability.

Plaintiff's argument that section 13.1 of the Carrier Agreement provides an exception to section 13.3 and therefore requires this Court to decide whether or not the tortious interference claims are arbitrable is misplaced. That provision states:

> 13.1 The Parties desire to resolve disputes arising of or relating to this Agreement without litigation. *Therefore, except for action seeking a temporary restraining order or an injunction relating to the purposes of this Agreement, or suit to compel compliance with this dispute resolution process*, the Parties agree to use the following alternative dispute resolution procedures as the sole remedy with respect to any controversy or claim arising out of relating to his Agreement or its breach.

(ECF No. 1-2 at 9 (emphasis added).) Plaintiff brought this matter through an Order to Show Cause seeking Temporary Restraints to compel compliance with this dispute resolution process articulated in the Carrier Agreement. However, the Carrier Agreement explicitly and unequivocally requires an Arbitrator to decide the issue of arbitrability. Accordingly, Defendant's Motion to Dismiss is **GRANTED**.

### B. Preliminary Injunction

Plaintiff argues preliminary injunctive relief is appropriate because Plaintiff did not agree to arbitrate disputes unrelated to the Carrier Agreement, and Defendant's tortious interference claims do not arise out of or relate to the Carrier Agreement because they deal with third parties. (ECF No. 5-3 at 5-9.) The Court, having found the parties manifested their clear and unmistakable intent to delegate to the arbitrator the threshold question of arbitrability and having granted Defendant's Motion to Dismiss Plaintiff's Complaint, **DISMISSES** Plaintiff's Motion for a Preliminary Injunction as **MOOT**. *See Pascarella v. Swift Transp. Co.*, 643 F. Supp. 2d 639, 653

(D.N.J. 2009) (dismissing the plaintiff's motion for a preliminary injunction as moot because the Court granted the defendant's motion to dismiss); *Twp. of W. Orange v. Whitman*, 8 F. Supp. 2d 408, 434 (D.N.J. 1998) (dismissing the plaintiff's motion for a preliminary injunction as moot because the Court granted the defendant's cross-motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6)).[3]

IV. **CONCLUSION**

For the reasons set forth above, Defendant's Motion to Dismiss is **GRANTED** and Plaintiff's Motion for Preliminary Injunction is **DISMISSED** as **MOOT**.

Date: November 15, 2017   */s/ Brian R. Martinotti*
   **HON. BRIAN R. MARTINOTTI**
   **UNITED STATES DISTRICT JUDGE**

---

[3] At Oral Argument, the parties conceded that if the Motion to Dismiss was granted, the preliminary injunction application was moot.